**MISSOURI PACIFIC RAILROAD COM-PANY, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 19144.**

United States Court of Appeals
Eighth Circuit.

May 1, 1969.

Rehearing Denied May 27, 1969.

Stuart A. Smith, Atty., Dept. of Justice, Washington, D. C., for appellant; Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson and J. Edward Shillingburg, Attys., Dept. of Justice, and Veryl L. Riddle, U. S. Atty., St. Louis, Mo., with him on the brief.

Quinn O'Connell, Washington, D. C., for appellee; Gerald J. O'Rourke, Jr., and Robert T. Molloy, Washington, D. C., Mark M. Hennelly, St. Louis, Mo., Vice President and General Counsel, Missouri Pacific Ry. Co., and Gilbert P. Strelinger, St. Louis, Mo., General Solicitor, Missouri Pacific Ry. Co., with him on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MEHAFFY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

This appeal involves the foreign tax credits to which the taxpayer is en-

titled to claim for income taxes paid to the Republic of Mexico for the years 1955 and 1956.

The taxpayer, Missouri Pacific Railroad Company, is a corporation organized under the laws of the State of Missouri, and is engaged in the business of operating as a common carrier by railroad in interstate commerce.

The taxpayer derives income from Mexican sources through the equipment interchange system. Freight cars owned by the taxpayer are delivered to the United States-Mexico border at interchange points where various Mexican railroads receive them and transport them to their destination in Mexico. The Mexican railroad, during the period that the taxpayer's car is located on its line, pays the taxpayer a fixed daily rental (per diem rate) for the car. The taxpayer loses control over the cars once they are delivered to the Mexican railroads.

In 1955 and 1956, the per diem rate for freight cars owned by United States railroads and used by Mexican railroads in Mexico was $3.40 per car day. The Republic of Mexico and the Association of American Railroads negotiated an agreement providing that $1.00 of $3.40 per diem rate payment would be withheld by the Mexican railroads in full satisfaction of the Mexican *income taxes*. The taxpayer is bound by this agreement. The per diem rate between United States railroads is $2.40. The total rentals earned by the taxpayer from Mexican railroads in these years were $1,048,838 and $1,100,872. Mexican income taxes of $307,985 and $313,893 were paid on these earnings.

The primary question below was whether the taxes paid to the Republic of Mexico constituted an income tax so as to permit the taxpayer to credit that amount against its United States income tax liability under §§ 901 and 903 of the 1954 Internal Revenue Code, subject to the limitations set forth in § 904 of the Code. The trial court held that the taxes paid to the Republic of Mexico did qualify as income taxes and the government does not appeal this issue.

The formula for computing the foreign tax credit as provided in § 904 of the 1954 Code is as follows:

$$\frac{\text{Taxable Income from Mexico}}{\text{Taxable Income from All Sources}} \times \text{U. S. Tax} = \frac{\text{Tax Credit}}{\text{Limitation}}$$

---

There is no dispute between the parties with respect to any of the factors in the formula except "taxable income from Mexico."

The taxable income from Mexico is computed by reference to § 862(b) of the 1954 Code which provides:

"b) *Taxable income from sources without United States.* * * * From the items of gross income specified in subsection (a) there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto, and a ratable part of any expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income. The remainder, if any, shall be treated in full as taxable income from sources without the United States."

The effect of the statute was explained in Missouri Pacific Railroad Co. v. United States, 392 F.2d 592, 602, 183 Ct.Cl. 168 (1968):

"Restating the statutory mandate in terms of the instant case, if an expense or other deduction, or some part thereof, can be definitely assigned to gross income earned in either the United States or Mexico, then it should be so assigned and no proration is necessary. De Nederlandsche Bank, 35 B.T.A. 53 (1936) * * *. Those deductions which cannot reasonably be directly assigned to one country or the other

should be allocated ratably between the two. International Standard Elec. Corp. v. Commissioner of Internal Revenue, 144 F.2d 487 (2d Cir. 1944),

cert. denied, 323 U.S. 803, 65 S.Ct. 560, 89 L.Ed. 640 * * *."

The government computed the taxpayer's Mexican net income as follows:

|      | Gross Income | Deductions | Net Income From Mexico |
|------|--------------|------------|------------------------|
| 1955 | $1,048,838   | $653,981   | $394,856               |
| 1956 | $1,100,872   | $685,534   | $415,338               |

The taxpayer's income tax return was filed with respect to income received in Mexico on a gross income basis without deducting any expenses. At trial, the taxpayer conceded that a portion of the running repair expenses was allocable to Mexican-source income. The taxpayer proposed that net income be computed as follows:

|      | Gross Income | Deductions | Net Income From Mexico |
|------|--------------|------------|------------------------|
| 1955 | $1,048,838   | $425,347   | $623,491               |
| 1956 | $1,100,872   | $429,300   | $671,572               |

The difference in the computation is the result of the different treatment afforded the costs of "running repairs" to taxpayer's freight cars and state property taxes imposed on the value of taxpayer's freight cars.[1]

The District Court adopted the taxpayer's method of allocation. It held that running repairs performed in Mexico should be assigned directly to income earned in that country, and that property taxes paid to by the railroad to the various states of the United States should be assigned directly and solely to income earned in the United States. Its decision on both these issues was contrary to earlier decisions of the Court of Claims. See, Missouri Pacific Railroad Company v. United States, *supra* (running repairs and state property taxes), and Chicago, Milwaukee, St. Paul & Pa-

cific R. Co. v. United States, 404 F.2d 960 (Ct.Cl.1968) (running repairs).

Before discussing the specific issues raised on this appeal, we review the law with respect to the burden of proof. This action had its origin in a suit by the taxpayer to recover taxes allegedly illegally assessed and collected for the years 1955 and 1956. The government's answer denied the taxpayer's right to recover and additionally claimed a setoff against the taxpayer based on an alleged erroneous computation of the taxpayer's foreign tax credits for the same years. Thus, the government had the initial burden of going forward and showing that there was a reasonable basis in fact or in law for its setoff defense. When it had done this, the taxpayer had the burden of establishing the proper tax due.[2]

1. The government has not appealed the deductibility of certain other expenses and, therefore, the government's computation of net income from Mexico is not precisely correct.

2. The Court of Claims in Missouri Pacific Railroad Company v. United States, 338 F.2d 668, 671–672, 168 Ct.Cl. 86 (1964),

in a suit where the railroad sought a refund, stated:

" * * * [T]he general theory upon which setoff defenses are based seems to require the result urged by the government. When a suit is brought for the recovery of taxes, the taxpayer must affirmatively show that he has

## FREIGHT CAR REPAIR COSTS

■ The taxpayer divides its freight car repairs into three classifications: (1) classified repairs, (2) user repairs and (3) running repairs. Our only concern is with the latter.[3]

Running repairs are largely unscheduled minor adjustments and repairs made on tracks or in trainyards involving brief delays. They normally consist of work not involving the body of the car costing less than $50. The repairs are usually made to wheels, axles, springs, braking systems and similar items. Railroads make running repairs to their own cars and cars belonging to other railroads (foreign cars) which are on their lines. Running repairs to foreign cars are billed by the repairing railroad to their owner at set rates established under the interchange rules.[4]

In 1955 and 1956, Mexican railroads made running repairs to the taxpayer's cars in the amounts of $51,374 and $45,865 ($ .167 and $ .142 per car day).[5]

overpaid his taxes since '[a]n overpayment must appear before refund is authorized.' Lewis v. Reynolds, supra, 284 U.S. 281 at 283, 52 S.Ct. 145 at 146, 76 L.Ed. 293. In other words, the taxpayer has the burden of proving the exact dollar amount to which he is entitled. See Helvering v. Taylor, 293 U.S. 507, 155 S.Ct. 287, 79 L.Ed. 623 (1935). This of necessity puts in issue every credit or deduction found in the particular tax return for which refund is sought or in a related tax return. However, this does not involve a redetermination of taxpayer's tax liability under unrelated tax returns for that year. We view the taxpayer's tax liabilities as a series of obligations arising from each tax imposed. Thus, when the government by way of a setoff challenges the validity of the tax treatment accorded an item found in the same tax return or in a related and dependent tax return * * *, we think that the burden of proving the correctness of the challenged item is ultimately on the taxpayer. * * *

"However, before the taxpayer has the burden of proving the correctness of the challenged item * * *, we think that the government has the burden of going forward and showing that there is a reasonable basis in fact or in law for its setoff defense. By this we mean that the government has to demonstrate that it has some concrete and positive evidence, as opposed to a mere theoretical argument, that there is some substance to its claim and is not a mere fishing expedition or a method of discouraging taxpayers from seeking refunds or meritorious claims because of the cost that would result in proving each and every item involved in a tax return. * * *." (Footnotes omitted.)

Dysart v. United States, 340 F.2d 624, 169 Ct.Cl. 276 (1965); Zeeman v. United States, 275 F.Supp. 235 (S.D.N.Y. 1967), aff'd, 395 F.2d 861 (2d Cir. 1968); Reuben H. Donnelley Corporation v. United States, 257 F.Supp. 747 (S.D. N.Y.1966). See, United States v. Pfister, 205 F.2d 538 (8th Cir. 1953). This is to be distinguished from Tax Court reviews of a Commissioner's assessment where government has the burden of proof. Zeeman v. United States, supra. See, Estate of Goodall v. C. I. R., 391 F.2d 775 (8th Cir. 1968).

3. For an explanation of the other two classifications, see Missouri Pacific Railroad Company v. United States, 392 F.2d 592, 183 Ct.Cl. 168 (1968), which involves many of the issues we face here but for prior years.

4. Repairs made by a Mexican railroad to a United States railroad car would be charged at the same rate for the same work which a United States railroad would charge another United States railroad for a running repair.

5. Car days are the total number of days that cars owned by the taxpayer are used in providing a transportation service. Roughly, it is computed as follows:

Number of Cars Owned × 365 = Total Car Days Unadjusted.
by Railroad

| Total Car Days Unadjusted | Total Days Cars Owned by Railroad Undergoing Repair | Total Days Cars Owned by Railroad are Surplus | Total Active Car Days |
|---|---|---|---|
| | — | — | = |

The taxpayer made on-line running repairs to its own cars in the United States in the amounts of $10,729,936 and $8,544,151 ($ .716 and $ .565 per car day) in the same years.

The taxpayer contends that running repairs should be expenses on a where-incurred basis. It argues that only those running repairs performed in Mexico by a Mexican railroad should be allocated to Mexican-source income. Repairs made in the United States should be assigned only to United States-source income. The taxpayer argues that this method would reflect the true costs of running repairs in each country.

The taxpayer justifies this allocation on the theory that running repair costs are a function of intensity of use—the more miles a car travels per day, the greater will be the costs of running repairs. The taxpayer contends that the disparity between per car day costs in the two nations is the result of a directly proportional greater intensity of use in the United States.

The taxpayer offered no direct evidence as to intensity of use in Mexico and conceded that no such evidence is available. Absent such evidence, the taxpayer supported its contention by introducing the testimony of an expert witness which tended to show that the function was valid. The expert analyzed the relationship in the United States between the cost of repairs of foreign cars on-line and taxpayer's cars on foreign lines and the intensity of use on and off-line. He concluded that running repairs reflected "the relative use to which a freight car

is put." He stated that the same relationship would be present with respect to the use of cars off-line in Mexico.

The government concedes there is a relationship between the intensity of use and the per day cost of running repairs. It disputes, however, the taxpayer's assertion that the where-incurred costs accurately reflect this relationship. The government contends that the allocation of costs on a where-incurred basis does not reflect the true cost of operating in Mexico and, therefore, the cost of running repairs must be allocated on a pro-rata basis in accordance with 26 U.S.C. § 862(b).

The government relies primarily on the testimony of its expert witness who testified that a significant factor affecting the costs of repairs made by off-line railroads was the conscious effort made by owner railroads to repair their cars on-line and limit off-line repairs. It supported its contention statistically by showing that a similar disparity in costs between on and off-line repairs was typical of United States railroads and that the taxpayer's costs paralleled those of other lines. The government argues that this pattern of costs indicates that the Missouri Pacific, along with other United States railroads, repairs its cars on-line rather than allow them to be repaired off-line. In this regard, the expert noted that off-line railroads are limited in the amount of work that they can perform and still bill the owner railroad. The expert also noted that each railroad is concerned with maintaining its own fleet of cars in an operating condition in order to reduce breakdowns and con-

---

Car days in Mexico are determined by dividing the per diem payments from Mexican lines by $3.40. All car days upon which a per diem payment is made are defined as active car days. The taxpayer has no idea of what happens to the cars once they pass below the border. In 1955 and 1956, the number of car days in Mexico were 308,482 and 323,786, respectively. Thus, the taxpayer had an average of approximately 845 and 885 cars in Mexico per day in the years 1955 and 1956, respectively. In the United States in 1955 and 1956,

the total number of car days were 14,976,637 and 15,145,717, respectively. The taxpayer owned an average of 46,911 and 45,362 freight cars in the years 1955 and 1956, respectively. Thus, less than two per cent of the taxpayer's cars were in Mexico.

There does not appear to be any dispute that the proper method to prorate for each year would be to total the expenses and divide by the total United States and Mexican car days and then multiply that figure by the respective car days for each country.

sequent freight delays.[6] The taxpayer did not directly attack this testimony.

The government also contends that the taxpayer's analysis proceeds from an unproven premise. The taxpayer compared the cost of foreign cars operated on its line with the cost of repairs of its cars operated off-line. The taxpayer then compared those costs with the intensity of use of cars on its lines and the intensity of use of cars on foreign lines.[7] The taxpayer did not introduce any direct testimony as to the intensity of use of cars on foreign lines in 1955 and 1956. Apparently, the taxpayer assumed that a comparison of the intensity of use between its line and the national average in 1960 would yield a ratio that would be constant and the taxpayer could then determine the intensity of use in 1955 and 1956. The government contends that the taxpayer's assumption is invalid. It contends there is nothing in the record which would lend support to the taxpayer's assumption that the ratio is a constant one.

In our view, the government satisfied its burden of going forward and showing that there was a reasonable basis for its setoff defense by establishing that the taxpayer had failed to deduct any of the running repair expenses from Mexican-source income. The taxpayer was then faced with the burden of establishing that portion of the running repairs which were properly allocable to Mexican-source income. We do not believe the taxpayer carried its burden. We hold that the trial court's conclusion that the taxpayer's running repair expenses should be allocated on a where-incurred basis was clearly erroneous.

The validity of the taxpayer's allocation is dependent upon a finding that disparity in costs between the two nations is unaffected by factors other than the intensity of use. This finding is required because 26 U.S.C. § 862(b) in effect requires that if expenses cannot be directly matched to income, the expenses must be allocated prorata between the two nations. If other factors intervene which result in distorting the cost of running repairs in Mexico, then allocation on a where-incurred basis would not result in the proper matching of Mexican income and expenses. The government has demonstrated that such additional factors are present.

The government has introduced expert testimony to the effect that railroads, including the taxpayer, maintain a policy of making as many repairs on-line as possible which will have the effect of reducing off-line repair costs. We also note that there was expert testimony to the effect that the mere passage of time alone will necessitate running repairs whether or not the cars are used. Thus, if a car merely remained in one place in Mexico, wear and tear would accumulate which would eventually require repair.

We have carefully examined the record, particularly the testimony of expert witnesses for both sides. The record shows that the intensity of use on Mexican lines may well be less than in the United States. It does not, however, establish the proposition that running repairs reflect accurately the true cost of operation in Mexico. The stated basis of the analysis made by the taxpayer's expert is an insufficient basis to conclude that the proper matching of Mexican income and expenses as required by 26 U.

---

6. The government points out in its brief that the Code of Interchange Rules of the Association of American Railroads provides that repairs should be made by the owner insofar as practicable. A railroad can do this because the cars return to the owner's line. The rules also provide that an off-line repair must be confined to the minimum consistent with safety. See, Missouri Pacific Railroad Company v. United States, *supra* at 609.

7. We note that the cost of repairs fluctuates markedly from year to year with apparently slight relationships to intensity of use. The intensity of use in 1956 declined slightly from 59.4 to 58.6 miles per day in 1955. At the same time, the cost of on-line repairs declined from $1.66 in 1955 to $1.03 in 1956. There is no apparent explanation for the difference.

S.C. § 862 would be met by allocation on a where-incurred basis. While the wear and tear may vary proportionately to use of the car, the government's contention that the taxpayer consciously performs running repairs at home to reduce off-line repairs remains uncontradicted.

## STATE PROPERTY TAXES

The taxpayer paid $1,371,858 and $1,488,349 in state property taxes in 1955 and 1956 on its freight cars. It allocated the taxes paid solely as a deduction against United States-source income. The government contends that the amount paid should have been ratably apportioned between United States and Mexican-source income, approximately ninety-seven per cent to the former and the balance to the latter.

The state property taxes were assessed by the several states against the total value of the taxpayer's freight cars regardless of the state or nation in which they were located. The taxes of each state were based on a proration of the total value of the cars to the several states in which the taxpayer operates on the basis of the miles of track in each state compared with the total miles of taxpayer's track. This method was used to avoid the necessity of ascertaining the number and the value of freight cars within the borders of each state in a given period. The method used assumed an equal distribution of freight cars throughout the system and did not take into consideration the fact that a number of the cars may be in Mexico or off-line in the United States in a state in which the taxpayer did not operate. The amount of state property tax paid to the several states was neither increased nor decreased by the presence of a taxpayer's cars in Mexico and their absence from the United States.

The taxpayer contends that the property taxes were paid only to those states in which it had tracks and that no state property taxes were incurred in Mexico or by reason of the presence of its cars in Mexico. Therefore, no portion of the state property tax on cars was properly allocable to Mexican-source income.

The government contends, " * * * [T]he state property taxes, like any other fixed cost of ownership, should be prorated on a car-day basis between both the United States and Mexican-source income." It stated in support of its contention:

" * * * [State property] taxes are assessed on the basis of taxpayer's ownership of the cars and not on its use of them in the United States. * * * [T]he amount of property taxes is not reduced on account of the presence of taxpayer's cars in Mexico and their absence from the United States. The only basis for these taxes is taxpayer's ownership of these railroad cars which enables it to use them in any manner it see fit, i. e., on its own lines or on the lines of other carriers pursuant to per diem leasing arrangements. * * * "

The District Court accepted the taxpayer's view. The parties assume that it did so for the reason expressed by the taxpayer in its brief, i. e., the taxes were incurred in the United States and are, therefore, directly allocable to United States-source income.

The government's view was accepted by the United States Court of Claims in an earlier case involving the same taxpayer but for different taxable years. Missouri Pacific Railroad Co. v. United States, supra at 604:

"It is true that taxpayer incurs no additional property taxes because of its car rentals in Mexico. Its property taxes would have been the same even if none of its cars had ever gone into Mexico. But this is also true of interest, depreciation, and other types of car ownership expense. For example, taxpayer paid interest only to American banks and incurred no interest charges specifically because of the presence of coaches in Mexico. But this does not mean, and taxpayer does not contend, that the total amount of interest charges attributable to coaches

should be allocated to United States operation. It simply means that such ownership expenses as property taxes are in the statutory category of expenses which cannot be specifically identified with the income from either country, and therefore, must be allocated ratably (by car days)."

We cannot accept the view of the Court of Claims or of the government in this case. We affirm the decision of the court below.

The taxpayer paid no property taxes in Mexico. Allocating a portion of the state property taxes to Mexican income can be justified or required only if the payment of such taxes was related to or necessary for the production of income. We cannot see that it was. Payment of the property taxes to the several states in no way affected the right of the taxpayer to operate in Mexico or enhanced its ability to earn income in that nation.

On the other hand, payment of state property taxes was directly related to the production of income in the several states of the United States. Indeed, a state is prohibited from imposing property taxes on property not connected with it. Thus, the only basis on which the several states may tax the value of all of the cars on the system, including those in Mexico, is that the cars located outside of the states imposing the tax enhance the value of the cars within the states imposing the tax. Norfolk & Western R. Co. v. Missouri Tax Com., 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968).

The Supreme Court said in *Norfolk* that it would not permit a state "under the shelter of an imprecise allocation formula * * * to 'project the taxing power of the state plainly beyond its borders.' " [8]

If we were to permit the allocation of a portion of the state property taxes to Mexico, we would, in effect, be permitting what has been forbidden by the Supreme Court. The only theory upon which the states can include the value of the cars in Mexico in computing the state tax is that the value of the Mexican cars, as a part of the total system, enhances the value of the cars within the several states of the United States and thereby

8. " * * * [A] State may impose a property tax upon its fair share of an interstate transportation enterprise. * * * That fair share may be regarded as the value, appropriately ascertained, of tangible assets permanently or habitually employed in the taxing State, including a portion of the intangible, or 'going-concern,' value of the enterprise. * * * The value may be ascertained by reference to the total system of which the intrastate assets are a part. As the Court has stated the rule, 'the tax may be made to cover the enhanced value which comes to the [tangible] property in the State through its organic relation to the [interstate] system.' * * * Such formulas usually involve a determination of the percentage of the taxpayer's tangible assets situated in the taxing State and the application of this percentage to a figure representing the total going-concern value of the enterprise. * * * A number of such formulas have been sustained by the Court, even though it could not be demonstrated that the results they yielded were precise evaluations of assets located within the taxing State. * * *

"On the other hand, the Court has insisted for many years that a State is not entitled to tax tangible or intangible property that is unconnected with the State. * * * In some cases the Court has concluded that States have, in fact, cast their tax burden upon property located beyond their borders. * * * The taxation of property not located in the taxing State is constitutionally invalid, both because it imposes an illegitimate restraint on interstate commerce and because it denies to the taxpayer the process that is his due. A State will not be permitted, under the shelter of an imprecise allocation formula or by ignoring the peculiarities of a given enterprise, to 'project the taxing power of the state plainly beyond its borders.' * * * Any formula used must bear a rational relationship, both on its face and in its application, to property values connected with the taxing State. * * *."
Norfolk & Western R. Co. v. Missouri Tax Com., 390 U.S. 317, 323–325, 88 S.Ct. 995, 1000, (1968) (Citations and footnotes omitted.).

enhances the ability of the taxpayer to earn income in the several states.

We, of course, are not called upon in this case to decide whether the value of the cars in the states are so enhanced. It is sufficient, for the purposes here, to note that no challenge to the right of the states to tax on the basis of the total value of the cars has been raised.

Categorizing state property taxes as an expense of ownership does not resolve the issue in the government's favor. A further inquiry must be made as to whether the ownership expense is related to the production of income in United States, Mexico, or both countries. State property taxes are exclusively related to the former. Interest and depreciation expenses are related to both.

Affirmed in part, reversed in part and remanded for further action consistent with this opinion.