**LIBERTY LIFE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 73–1538.

United States District Court,
D. South Carolina,
Greenville Division.

Aug. 20, 1977.

David A. Merline, Greenville, S.C., for plaintiff.

J. D. McCoy, III, Asst. U.S. Atty., Greenville, S.C., Hubert M. Doster, Fred Luyties, James E. Crowe, Jr., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

This action was instituted by the plaintiff Liberty Life Insurance Company pursuant to 28 U.S.C. § 1346(a), seeking to recover income taxes in the amount of $87,660.71 for the year 1965, including interest, alleged to have been erroneously collected from it by the defendant.

The dispute arises from the adoption by Liberty Life of a novel accounting method whereby certain items are considered to be investment expenses within the meaning of 26 U.S.C. § 804(c)(1). The United States asserts by way of set-off, a claim for taxes not paid for the year 1965, alleging that certain items were erroneously included as interest paid within the meaning of 26 U.S.C. § 805(e).

The parties entered into a stipulation of facts and exhibits and trial was had on the remaining portions of the case on July 22, 1975. It is upon the testimony at trial and the stipulated facts and exhibits that the Court makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. The Court incorporates by reference the stipulation of facts and exhibits submitted by the parties and admitted into evidence with the exception of paragraph 19, as agreed by the parties.

2. Plaintiff Liberty Life Insurance Company, a corporation organized under the laws of the State of South Carolina, with its principal place of business in Greenville, South Carolina, filed a timely United States

Life Insurance Company Income Tax Return (Form 1120L) for the calendar year 1965 and paid the taxes shown to be due thereon in the amount of $1,232,224.61.

3. The Internal Revenue Service audited plaintiff's 1965 tax return and assessed additional taxes of $103,417.34, plus interest of $18,166.03 on February 20, 1969. Plaintiff paid the additional taxes plus interest.

4. On March 11, 1971, plaintiff filed a timely claim for refund of taxes paid for the year 1965 in the amount of $87,660.71, plus interest. In November of 1973 plaintiff filed a timely supplemental claim for refund for 1965, making changes in calculations, but requesting refund in the same amount as in the original claim.

5. In November, 1971, the Internal Revenue Service notified plaintiff that it had disallowed the original claim for refund.

6. On November 21, 1973, Liberty Life filed a timely complaint in this Court seeking a refund of taxes paid for the year 1965. Plaintiff challenged only the following issues: inclusions of prepaid expenses in assets, disallowance of a portion of plaintiff's 801(b) reserve on the grounds that it is an unearned premium reserve, the disallowance as investment expenses of a portion of the South Carolina graded license fee, advertising expenses and commissions.

7. Defendant filed a general denial and, in addition, alleged as set-off against any refund which might be obtained by plaintiff an additional adjustment due to the inclusion of certain items as discounts in the nature of interest. Plaintiff replied with a denial.

8. Plaintiff and defendant have reached agreement on the following issues raised by plaintiff's claim: advertising expenses (Stip., par. 12), prepaid expenses (Stip., par. 21), unearned premium reserve (Stip., par. 24).

9. The only issues remaining for decision by this Court are: plaintiff's claim as investment expenses of a portion of the South Carolina graded license fee and of commissions and defendant's claim of set-off for interest paid.

10. There is no dispute as to venue or jurisdiction.

*COMMISSIONS:*

11. On its 1965 income tax return, Liberty Life claimed a deduction of $238,356.00 as an investment expense. The sum claimed represented a portion of the commissions paid to branch managers, staff managers and combination agents (hereinafter field representatives) which was claimed to have been paid as compensation for work done in making and servicing policy loans.

12. Under the insurance tax code, policy loans are considered to be investments.

13. Liberty Life is atypical of other insurance companies in that its field representatives perform duties in connection with policy loans ordinarily handled by home office personnel. These duties include explaining the terms of the loans, filling out applications, processing the loan application, personally delivering the loan checks, collecting the loan payments, etc.

14. These duties consume a substantial amount of the time of the combination agents, staff managers and branch managers. Staff managers and branch managers have duties in connection with each loan application and must also perform the duties of any combination agent who is unavailable. A time study conducted in 1974 confirmed that a substantial amount of the time of field representatives (5%) was spent in performing their duties in connection with making and servicing policy loans. Testimony established that substantial amounts of time is spent in performing such duties.

15. Evidence established that more time was spent by the field representatives in servicing policy loans already in force than was spent in making new loans.

16. Field representatives are given no separate compensation for their services in connection with policy loans.

17. Contracts with the field agents provide, and the Court finds, that compensation (commissions) was provided for all

services rendered the company. Commissions included compensation for making and servicing policy loans. Defendant concedes as much. (Defendant's proposed findings, par. 11).

18. Field representatives were paid by commissions. Agents' commissions are based on a percentage of premiums collected for policies in force and a separate percentage for acquiring a new policy. The percentage is determined by a number of factors including the type of policy, size of the policy and premium payment, the frequency of payments (whether weekly or monthly), longevity, and so forth. None of the factors included in determining the size of the commissions is directly related to the services rendered in connection with making and servicing policy loans. No separate compensation is received for these services although the employment contract states that the compensation is also for services, which would include services connected with policy loans. Staff managers and branch managers are also compensated by commissions based on the performance of their personnel. They also are paid for their services and are not separately compensated for work done in connection with policy loans.

19. Field representatives are also required to make policy loans for policies which are fully paid. Field representatives are not given commissions on policies which are fully paid.

20. In order to arrive at a figure for the amount paid to field representatives for services in connection with policy loans, Liberty Life multiplied the number of new policy loans on weekly premium, monthly debit and ordinary life policies serviced by combination agents by $2.00 and multiplied the number of loans in force on weekly premium, monthly debit and ordinary life policies services by combination agents during the tax year by $4.00. The total arrived at was $238,356.00 which was deducted as an investment expense on plaintiff's tax return.

21. It is unclear precisely how the $2.00 and $4.00 figures were arrived at. However, the Court concludes on the basis of the testimony that they were reasonable amounts for the agents' time spent in performing their duties. As calculated, $2.00 represented the value of all of the field agents' time spent during one year on a new policy. The duties included filling out, approving, processing and delivering applications for loans. The $4.00 figure represented the value of all of the field agents time spent during one year in collecting payments and performing other duties associated with a loan already in force. The evidence established that substantially more time is consumed performing these duties than is spent in obtaining and processing new policy loans.

22. The method of allocating a portion of commissions to the category of investment expenses is inconsistent with the methods used by the National Association of Insurance Commissioners on their Annual Statement.

23. Liberty Life did not allocate any portion of its commissions to the category of general expenses or investment expenses in its Annual Statement for 1965.

*LICENSE FEE:*

24. Under South Carolina law a domestic life insurance company is required to pay a license fee:

"Two per cent graded license fee on domestic life insurance companies.—In addition to any and all other license fees or taxes there is hereby imposed upon each domestic life insurance company of any class licensed by the Commissioner and incorporated under the laws of this State, an additional and graded license fee in an amount equal to two per cent of the total premiums, that is, total premium income or total premium receipts, from insurance contracts issued to residents of this State or paid from a point located within this State, less any dividends or bonuses paid in cash or applied in abatement of premiums or credited to policyholders of such company, as collected from citizens of or residents of this State during the year next preceding the date of the return.

Such premiums shall not include considerations received from annuity contracts. The additional and graded license fee imposed in this section shall not exceed five per cent of the net income of the company as determined under the provisions of chapter 5 of Title 65; provided, that in addition to the deductions allowed by such chapter there shall be allowed in computing net income any addition to policy reserves as may be required by the Commissioner, but no more than such required amount." § 37–130.1, Code of Laws of S.C., 1962.

25. In 1965, 2% of premiums gathered within the State of South Carolina by Liberty Life would have amounted to $475,-946.42. Accordingly, Liberty Life paid 5% of its net income, or $222,911.93, following examination by the South Carolina Tax Commission.

26. Net income includes investment income. Liberty Life calculated 5% of its gross investment income amounted to $173,-344.75 and claimed that sum as an investment expense in its supplemental claim for refund to the Internal Revenue Service. Plaintiff contends that the inclusion of investment income by the South Carolina license fee constitutes a tax on investment and is, therefore, deductible.

27. South Carolina imposes on foreign life insurance companies a license fee based on 2% of premiums collected with the State. § 37–122, Code of Laws of South Carolina (1962). A reduction of the license fee is available for instate reinvestment in specified securities and property of over 25% of the reserves of South Carolina policies. § 37–123, Code of Laws of South Carolina.

28. Domestic insurance companies are exempt from normal state corporation income tax and capital stock tax.

*DISCOUNTS IN THE NATURE OF INTEREST:*

29. Liberty Life offers mortgage cancellation insurance, now in the form of decreasing term, level premium policies. Mortgage cancellation insurance is obtained by a borrower from a savings and loan association and is designed to pay his indebtedness in the event of his death prior to repayment of the obligation.

30. The savings and loan association is the beneficiary of the policy and also sells the insurance and receives a commission for sales made.

31. The savings and loan also collects the monthly premiums. Originally, the premiums were paid monthly to Liberty Life by the savings and loan.

32. However, beginning in 1946, Liberty Life agreed to accept an annual payment from the savings and loan association in an amount less than the total of the monthly payments. The savings and loan associations continued to collect full monthly payments from the policyholders (borrowers).

33. It is the difference between the total monthly payments and the lesser annual payment, *mutatis mutandis*, which is the source of the dispute here.

34. In 1956, Liberty Life began offering a choice between annual and monthly "modes" of payment on its policy forms. In that same year plaintiff began calculating its monthly premiums by taking a percentage of its annual rate (.08833 × annual rate). Use of the formula resulted in total monthly payments greater than the annual rate.

35. The technique of taking a percentage of an annual rate to arrive at a monthly rate is typical of conversion from one "mode" of payment to another.

36. As of 1965, the year in question, Liberty Life offered only decreasing term, level premium mortgage cancellation insurance. For policies over $5,000 in that year, plaintiff charged a $10.00 "policy fee" for annual premiums. Monthly premiums were calculated as follows: .085 × annual rate + $.90. Thus, a larger sum was paid both for the basic charge for coverage and for the "policy fee" when paid monthly than when paid annually.

37. In its 1965 tax return plaintiff claimed the difference between total annual and total monthly payments (including the

"policy fee") as discounts in the nature of interest on prepaid premiums.

38. Should a policyholder cancel the insurance, Liberty Life refunds the remaining amount of the payment beyond the end of the month of cancellation. This refund does not include interest.

39. Annual premium life insurance policies refund unearned premiums at death. This refund is termed a "death benefit".

40. Liberty Life calculates its reserves on mortgage cancellation insurance by use of the mid-terminal reserve system, traditionally used in the industry for monthly payment policies. However, its reserves could as easily be calculated by use of the mean reserve method although such a transfer would involve a great deal of expense. Annually paid premiums may also be calculated by use of the mid-terminal reserve method. No distinction which would advance this inquiry appears to exist between the two systems.

41. Liberty Life did not calculate its annual premium by calculating the present value of future payments. If such a calculation had in fact been used, the interest factor would have been substantially higher than that used to calculate its "Advance Premium Deposit Agreements". This agreement permits a policyholder to pay future payments by paying their present value using a specific rate of interest. The policyholder is then credited with the full payment each year when the premium falls due. The difference between the present and future value of the premiums is then considered to be a discount in the nature of interest on prepaid premiums.

42. The discount for annual payment consisted in large part of savings on expenses. By receiving payment annually Liberty Life was not required to make separate entries for monthly payments, separate billings, etc. A substantial amount of savings was also had in commissions which were not paid to the savings and loan associations.

43. Plaintiff did not report the "deductions" as interest paid to the Internal Reve-

nue Service (Form 1099) as would be required by law if the deductions did represent interest.

44. The Court finds that the annual payment for mortgage life insurance was a "mode" of payment. The lesser amount paid was the result of expense savings; and to some extent, the value of the use of money from the beginning of the year. Certain competitive advantages would also result from the offering of such a discount.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this case. 28 U.S.C. § 1346(a). Venue is uncontested.

*COMMISSIONS:*

2. Liberty Life has adopted a novel method of accounting whereby certain amounts of the compensation paid to their field representatives would be allocated to investment expenses.

3. The Income Tax Regulations § 1.804–4(b)(1)(i) defines investment expenses, Delphically, as "those expenses of the taxable year which are fairly chargeable against gross investment income". "General expenses", that is, expenses incurred for the benefit of more than one department, may be allocated among the departments which they benefit. § 1.804–4(b)(1)(ii).

4. Policy loans are investments, due to the fact that they earn interest, and are treated as such by the Internal Revenue Service. Nash, *Federal Taxation of Life Insurance Companies*, Vol. 1 § 31.19(3), pp. 31–52 (1974).

5. Thus, expenses incurred in the making and servicing of policy loans may be considered to be investment expenses. Salaries of personnel working in the investment department handling policy loans may be deducted as an investment expense. Salaries of those who contribute a part of their time for the benefit of the investment department may be apportioned to investment expenses.

■ 6. No relevant distinction exists between apportioning a straight salary and compensation paid on a commission basis. That portion of money paid to an agent which represents compensation for services rendered to the investment department may be considered to be an investment expense.

■ 7. The Court has found that $2.00 is a reasonable amount to be considered to be compensation to be paid for the substantial services rendered by field representatives during the first year of a policy loan. The Court has also found that $4.00 represents a fair amount to be considered compensation paid for the greater services rendered by field representatives during the year that a policy loan is in force.

8. While the method of allocation is acceptable, it is not the best method of arriving at a proper allocation.

9. Plaintiff was entitled to allocate $2 per new policy and $4 per policy in force to the category of investment expenses.

10. The United States argues that the method of accounting employed by the plaintiff is inconsistent with the methods approved by the National Association of Insurance Commissioners for its Annual Statement. The Internal Revenue Code, 26 U.S.C. § 818(a), provides:

"(a) Method of accounting.—All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary or his delegate, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners."

■ 11. The Court does not read the Code as requiring that otherwise allowable tax deductions under the Code are barred by the instructions of the NAIC. See *Jefferson Standard Life Insurance Company v. United States*, 408 F.2d 842 (4th Cir.1969). Nor is the reverse true, that deductions allowed by the NAIC should be considered proper under the Code. The NAIC instructions must be considered "guidelines" and in no way conclusive of the issues in this case.

*LICENSE FEE:*

12. Liberty Life's position is that as "net income", 5% of which is the upper limit of the state license fee, includes investment income, the license fee is in part an investment tax, or investment expense, and therefore deductible.

13. If the South Carolina license fee were based on premium receipts alone and did not include "net income" in the calculation at all plaintiffs would not have a case. The entire amount would be charged as a part of "insurance expenses".

14. The South Carolina license fee is based on premium receipts alone. Investment income becomes a factor only in the event that 2% of the premium receipts exceeds 5% of net income, including investment income. Investment income is merely a factor in determining a limit to liability and does not form the basis of the liability.

15. Plaintiff's position is the result of a logical fallacy. It is not enough to argue that "but for" the inclusion of investment income in the calculation of net income plaintiffs would have paid $173,344.75 less. The argument does not establish that the amount paid was caused by the inclusion of investment income. In fact, the contrary is true. "But for" the limitation to 5% of net income (including investment income) the plaintiff's license fee would have been substantially greater. The inclusion of net income in the formula reduced the amounts due to the State of South Carolina.

■ 16. As the state license fees were not the result of investment income they

were not investment expenses and Liberty Life is not entitled to allocate a portion of the fee to investment expenses.

17. Plaintiff further argues that since the license fee is only imposed on domestic insurance companies, which would normally have extensive instate investments, the fee is imposed for the privilege of doing business in South Carolina, including investment activity. The fee should, therefore, be considered to be in part an investment expense.

18. Liberty Life ignores South Carolina Code § 37–122 which imposes an identical 2% graded license fee on foreign life insurance companies. South Carolina Code § 37–123 offers a reduction of the license fee for reinvestment of over 25% of the reserves of South Carolina policies which are reinvested instate in specified securities and property. Thus, an incentive is offered for local investment by foreign life insurance companies. Foreign and domestic companies' fees are assessed on the same base. Domestic companies' fees are cut off at 5% of net income but no corresponding limitation is granted to foreign companies.

19. The South Carolina fee is based *solely* on premium income from within the state. It is in no way connected with the amount of investment activity within the state or elsewhere. If Liberty Life collected no premiums in the state but did make extensive investments, it would pay no license fees at all. Since no expense is incurred as the result of conducting investment business within the state, no portion of the license fee may be treated as an investment expense.

*DISCOUNTS FOR PREPAYMENT:*

20. In its answer to plaintiff's claims for overpayment on the preceding issues, the United States raised as an offset tax allegedly due on certain deductions subsequently disallowed by the Internal Revenue Service. The three-year statute of limitations would otherwise have barred the United States from assessing the deficiency but it is permitted to raise the issue as an offset to any refund to which the plaintiff may be entitled. *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932). Should the United States prove that a reasonable basis exists for the offset, the burden shifts to the plaintiff to establish that it was entitled to treat the items as discounts in the nature of interest. *Missouri Pacific Railroad Co. v. United States*, 338 F.2d 668, 168 Ct.Cl. 86 (1964); *Missouri Pacific Railroad Co. v. United States*, 411 F.2d 327 (8th Cir.1969).

22. The Court finds that defendant met its burden of proof that there is a reasonable basis for its position that plaintiff was not entitled to treat its annual premiums on mortgage cancellation insurance as discounted prepaid premiums and the difference between the annual and aggregate monthly payments as being in the nature of interest.

23. 26 U.S.C. § 805(e)(3) defines as "interest paid" within the meaning of "policy and other contract liability requirements" referred to in 26 U.S.C. § 804(a):

"*Discount on prepaid premiums.*—All amounts accrued for the taxable year for discounts in the nature of interest . . . on premiums or other consideration paid in advance on insurance or annuity contracts."

24. This portion of the Code was passed in response to two decisions, *Commissioner of Internal Revenue v. Monarch Life Insurance Company*, 114 F.2d 314 (1st Cir.1940) and *Illinois Life Insurance Company v. Commissioner*, 30 B.T.A. 1160 (1934), affirmed, 80 F.2d 280 (7th Cir.1935), reversed on other grounds, 299 U.S. 88, 57 S.Ct. 63, 81 L.Ed. 56 (1936). While the facts of the latter case are unclear, in the former, the company apparently permitted the policyholder to deposit funds with the company in advance of the due date. The company calculated the present value of the future premiums at a certain interest rate and permitted the policyholder to deposit the reduced amount. At the time each policy fell due, the policyholder's account was credited with the full amount of the premium. The court refused to consider the discount to constitute interest paid.

25. The system undertaken by Liberty Life in effect is annual coverage and not a prepayment of monthly premiums, regardless of the method used by the savings and loan association to collect their payments from the borrowers. The coverage effected by this plan was, in effect, annual. The repayment of unearned premiums in the event of cancellation during the term and the use of the mid-terminal reserve method of accounting do not mitigate against such a conclusion.

26. Further, the discount given was not in the nature of interest. The discount went, in this case, to the beneficiary-agent (the savings and loan) rather than to the policyholder. The arrangement was of mutual benefit in that both parties saved a substantial amount in bookwork and other costs by entering into such an arrangement. An additional advantage was offered to the insurance company in its competitive position against other companies seeking the same markets.

27. Since the amounts in question were neither prepaid premiums nor discounts in the nature of interest, the Court concludes that the Government must prevail on its offset.

*CONCLUSION:*

The Court, therefore, finds that plaintiff's deduction of a portion of its commissions as investment expenses on its 1965 income tax return was permissible under the Code, that its deduction of a portion of the South Carolina graded license fee as an investment expense was impermissible. The Court finds that defendant must prevail on its counterclaim as plaintiff's treatment of the difference between its annual premiums and the total of the monthly premiums for mortgage cancellation insurance as discounts in the nature of interest was inconsistent with the Code.

Judgment shall be entered accordingly.